# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40652**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Kyshown D. CAMPBELL**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary[1]

Decided 11 March 2026

———————————

*Military Judge*: Lance R. Smith.

*Sentence*: Sentence adjudged on 3 November 2023 by GCM convened at Luke Air Force Base, Arizona. Sentence entered by military judge on 16 January 2024: 60 days confinement, forfeiture of $836.00 pay per month for 6 months, and a reprimand.

*For Appellant*: Captain Michael J. Bruzik, USAF.

*For Appellee*: Major Vanessa Bairos, USAF; Major Kate E. Lee, USAF; Major Jocelyn Q. Wright, USAF; Captain Heather R. Bezold, USAF; Mary Ellen Payne, Esquire.

Before GRUEN, KEARLEY, and MORGAN, *Appellate Military Judges*.

Judge KEARLEY delivered the opinion of the court, in which Senior Judge GRUEN and Judge MORGAN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

[1] Appellant appeals his conviction under Article 66(b)(1)(A), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(b)(1)(A). *See Manual for Courts-Martial, United States* (2024 ed.).

KEARLEY, Judge:

A general court-martial composed of a military judge alone convicted Appellant, contrary to his pleas, of one specification of domestic violence, in violation of Article 128b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928b.[2,3] The military judge sentenced Appellant to confinement for 60 days, forfeiture of $836.00 pay per month for six months, and a reprimand. The convening authority took no action on the findings or sentence, but provided language for the reprimand.[4]

Appellant raises four issues on appeal, which we have reworded: (1) whether the military judge erred in admitting evidence of certain video clips without a proper foundation; (2) whether the military judge abused his discretion by admitting evidence of uncharged misconduct to show Appellant's motive for the convicted offense; (3) whether the military judge's finding of guilty for domestic violence was factually and legally sufficient; and (4) whether the Government violated Appellant's right under Article 13, UCMJ, U.S.C. § 813, to be free from conditions of pretrial confinement more rigorous than necessary to ensure his presence at trial. While not raised by Appellant, we have also considered: (5) whether Appellant is entitled to relief due to post-trial delay.

We find no error that materially prejudiced Appellant's rights, and we affirm the findings of guilty and sentence.

## I. BACKGROUND

Appellant and his wife, RC, who was also an Airman, were assigned to Luke Air Force Base (AFB), Arizona. They were married for five years. They did not have children together, but RC's nine-year-old son from a previous relationship, PC, lived with them.

---

[2] Unless otherwise noted, all references in this opinion to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Appellant was found not guilty of one specification of sexual abuse (indecent language) upon a child, and two specifications of sexual abuse (indecent exposure) upon a child, in violation of Article 120b, UCMJ, 10 U.S.C. § 920(b); and one specification of indecent recording, in violation of Article 120c, UCMJ, 10 U.S.C. § 920c.

[4] The convening authority denied Appellant's request "for deferment of all adjudged forfeitures until the military judge signs the entry of judgment."

2

On or about 30 June 2021, Appellant was preparing for a deployment. RC was helping him pack his bags while Appellant went to do some out-processing on base. Appellant called RC and asked if she had seen his deployment folder. In her efforts to help Appellant find his folder, RC went into Appellant's backpack and noticed a small wireless headphone case. Since they did not have wireless headphones at the time, she was confused, so she opened it. Inside she found an SD card[5] and a small tool, commonly referred to as an ejector pin, to open a phone and replace the SD card.

RC used the ejector pin to pop out the SD card on her own cellular phone and replace it with the one she found in Appellant's bag. She noticed a substantial amount of memory was being used and located a folder labeled "My Bitches." She determined the folder included sexual videos and photos and she recognized a few of the names of the women in the folder.

RC decided to hide the SD card. She taped it under the television ledge in the living room. RC then called her friend, GG, and told her about finding Appellant's SD card. RC then called Appellant, indicated she found the SD card, and hung up the phone. RC anticipated Appellant would be angry, so she took measures to prevent Appellant from entering the house. She removed the battery pack from their front door keypad and tried to deactivate the electric garage door. She also made sure the back door was locked.

Appellant called RC several times, but she did not answer. While still on the phone with GG, RC finally answered one of Appellant's calls and told him she "found something" and hung up the phone. Within 15 minutes, Appellant was at the house standing outside the front door. RC continued to talk with GG on speaker phone about what she had found, saying things like "[she] remember[ed] specifically one female that [she] had seen," and "[she] couldn't believe [this female] had come into [RC's] home." RC was "very emotional." When RC realized Appellant was no longer at the front door, she turned around and saw the backdoor open.

Appellant, now inside the house, told RC to hang up the phone and give him the SD card. He tried to grab her phone. They went into their home office where Appellant grabbed RC's government common access card (CAC) and told her to give him the SD card or he would destroy her CAC. When she did not give him the SD card, Appellant cut her CAC with scissors.

Appellant chased RC around the house trying to grab her phone. RC told him the SD card was not in her phone. Appellant punched RC in her left rib

---

[5] A secure digital (SD) card is a small physical device used to store digital files.

cage two times, causing her to release the phone. Appellant threw the phone onto the floor and shattered it by stomping on it. As a result, RC's call with GG was disconnected. It was these two strikes to RC's ribcage that formed the basis for the Specification of Charge III, domestic violence, in violation of Article 128b, UCMJ.

Appellant then walked towards the kitchen while RC got up and proceeded towards her shattered phone. RC heard her son, PC, screaming and yelling at Appellant, telling him to please stop, "Dad you don't have to do this," and "Dad I don't want my family to be like this."

GG tried to call RC back. After getting no answer, GG called Appellant, who answered on speaker phone. GG asked to talk with RC and warned Appellant that she would call the police if he refused. Appellant replied, "Call the cops, Bitch," and hung up the phone. Then Appellant told RC to "clean up and get [herself] together," told PC to stop crying, and then told RC not to "take his career" because it is how he provided for his daughter.

Meanwhile GG called the local Air Force Office of Special Investigations (OSI) detachment, which is where she worked, and asked the duty sergeant to call the local police and request a welfare check on RC and Appellant. GG also asked a mutual friend, BM, to go to RC's house to check on the situation since GG was out of town. Soon after, the police, BM, and Master Sergeant (MSgt) SS from Appellant's squadron all arrived at the scene. RC asked BM to take PC for the night. As BM drove PC away, PC became emotional and expressed concern for his mother.

RC and Appellant told the police their argument was verbal, not physical. RC told them that Appellant did not hit her. However, she also told them she wanted Appellant to leave for the night so she could have time to process what happened. They both told the police they are in the military and Appellant was planning on deploying within a few days. Appellant gathered a few items for the night and left the house as police waited.

MSgt SS remained at the house with RC, who was still emotional. RC insisted nothing was wrong with her physically. RC put her wedding ring, the SD card, and the ejector pin in a pouch and gave the pouch to MSgt SS because she did not want these items in the house.

After MSgt SS left, RC claimed that she went to her neighbor's house and explained what happened, including the punches to her ribs. Her neighbors gave her a specific cream to help with her pain and gave her gauze wrap. They encouraged her to tell somebody. One of the neighbors also helped RC secure her back door with a chain lock.

As RC reflected on the incident, she decided she did not want to harm Appellant's career and felt it would be best if he left on his scheduled deployment. She did not report the incident further because she "didn't want anybody [she] was close with or military to know what she went through." Appellant left for his deployment a few days later. RC received the pouch back from MSgt SS and put the SD card in her safe.

Appellant filed for divorce during his deployment. He claimed RC shared some of the sexually explicit videos from the SD card with women shown in the recordings. According to Appellant, these women informed him that RC had sent them the videos. Appellant also claimed RC sent the videos to Appellant's sisters and grandmother.

The mother of Appellant's daughter later told RC that she saw a video of Appellant involved in "sexual situations . . . with [a child present and that child's mother]." Another woman, Appellant's ex-girlfriend, also notified RC that she had found some of the same videos on an SD card in 2015 and noticed a child present.

RC's military leadership team received notice that some videos showed sexual acts with children present and subsequently told RC that she needed to report the matter and give the SD card to OSI.

Upon inspection, OSI determined the SD card contained approximately 1500 videos and images of consensual sex that Appellant had recorded or received from other women. Two videos showed an unidentified toddler in the vicinity of the camera. Three other videos showed Appellant's daughter nearby.[6]

## II. DISCUSSION

### A. Authentication of Video Evidence

#### 1. Additional Background

At trial, in an effort to prove the charged offenses of sexual abuse of a child and indecent recording, in violation of Articles 120b and 120c, UCMJ, the Government sought to introduce as prosecution exhibits, five video files. These

---

[6] These five videos formed the basis for the offenses of which the military judge acquitted Appellant -- sexual abuse (indecent language and indecent exposure) upon a child and indecent recording.

video files showed Appellant engaged in sexual acts with another woman, other than RC, while a child was present. RC found these videos on Appellant's SD card on the day of the charged domestic violence offense; however, she did not initially realize there was a child at some point in each video. RC testified to various facts about the video. She described that some of the videos were recorded at her home. RC recognized the name of one woman in two of the videos, and she personally knew the other woman in the three remaining videos. She also recognized the children in the videos. In addition to identifying Appellant, the women, and the children, RC could also identify the children's ages, and the location and time frame of the videos.

The Defense objected to the admission of the videos based on Mil. R. Evid. 1002, the best evidence rule, claiming that the proponent of the evidence must produce the original or the duplicate. The Defense went on to argue that the Government could not admit the video evidence through RC because she was not in any of the videos and is unable to properly authenticate or lay the foundation for the videos because she cannot state the videos were a fair and accurate representation of what actually occurred at the time of the recordings.

After hearing from trial counsel and trial defense counsel, the military judge initially sustained the objection as to authenticity and foundation. Trial counsel then asked RC a series of questions about each video in an attempt to authenticate the videos and lay the foundation necessary for their admission. Trial defense counsel and trial counsel conducted a voir dire of RC.

Ultimately, the military judge overruled the objection with respect to all five videos and announced his ruling in open court, on the record. The military judge explained that RC noted the exhibits were a fair and accurate representation of what she had previously seen on the SD card, and she had viewed enough of the recordings on the SD card to identify Appellant and other people in the recordings, their voices, and the locations where the recordings were made. The military judge explained that "although not perfect, the court finds [RC] has laid a legally sufficient foundation for the admission of [the five videos]." The military judge indicated RC, for the most part, maintained control of the SD card until it was turned over to the OSI. He pointed out that both RC and an OSI agent (Special Agent JF) testified that the exhibits were a fair and accurate representation of the version of the videos found in Appellant's SD card. The military judge stated that RC basically did the same thing as an OSI agent did in *United States v. Poole*, No. ACM 39308, 2019 CCA LEXIS 235, at *22 (A.F. Ct. Crim. App. 15 May 2019) (unpub. op.), where the appellant challenged the foundation presented through a government witness (OSI agent) for extracted recordings from his phone.

Specifically, the military judge stated:

> In its holding, the [United States] Air Force Court of Criminal Appeals stated, as noted above, the 14 videos contained on Prosecution Exhibit 4 constituted the primary evidence against [the appellant]. Special Agent [JH] testified that he reviewed the data extracted from the appellant's cell phone, reviewed each of the videos in Prosecution Exhibit 4, and described them as a fair and accurate depiction of the videos found on [Appellant's] cell phone. He testified that he was able to identify the naked female appearing in the videos . . . the location depicted in the videos . . . and the person recording the videos . . . . That testimony satisfied the requirements of [Mil. R. Evid.] 901.

The military judge pointed out how RC found the recordings on the SD card and eventually turned them over to law enforcement. The military judge found the "videos are directly related to the Article 120b and Article 120c charges" in the case. He said the high probative value of the videos is not substantially outweighed by the danger of unfair prejudice. He further pointed out that the videos are "evidence of the alleged offenses" and therefore, there is no concern about the evidence confusing the issues or misleading the factfinder. Accordingly, the five videos were admitted as Prosecution Exhibits 5–9.[7]

During trial, Appellant discussed the text he received from RC indicating she had found the SD card and he described that he was "shocked, a little embarrassed." He explained, "I got caught cheating. There was an SD card out for her to see. It contained files of other women inside the video." Trial counsel utilized the videos during trial by displaying the images during a portion of his cross-examination of Appellant. During closing arguments, trial counsel referred to the contents of the SD card primarily when arguing the charged specification of sexual abuse of a child in violation of Article 120b, UCMJ, and the alleged indecent recording specification in violation of Article 120c, UCMJ. Appellant was acquitted of both these offenses.

---

[7] Later, trial defense counsel objected to the Government playing the videos in open court, claiming that it was cumulative. Trial counsel argued that he would be using the videos to ask questions of Appellant during his cross-examination. The military judge overruled the objection and trial counsel used the videos to question Appellant. Measures were taken to ensure that the screen used by trial counsel was not facing the gallery.

**2. Law**

"The proponent of the evidence has the burden of demonstrating that the evidence is admissible." *United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020) (citations omitted).

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Norwood*, 81 M.J. 12, 17 (C.A.A.F. 2021) (citations omitted). "A military judge abuses his discretion when his findings of fact are clearly erroneous, [his] decision is influenced by an erroneous view of the law, or [his] decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citations omitted).

Mil. R. Evid. 901(b) provides a non-exhaustive list of examples of evidence that satisfies the authentication requirement including, *inter alia*, testimony of a witness with knowledge that an item is what it is claimed to be (Mil. R. Evid. 901(b)(1)); the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" (Mil. R. Evid. 901(b)(4)); and "an opinion identifying a person's voice" (Mil. R. Evid. 901(b)(5)).

The requirement of authentication is satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it is." Mil. R. Evid. 901(a). The proponent "need only show by direct or circumstantial evidence of 'a reasonable probability' that the evidence is authentic." *United States v. Harris*, 55 M.J. 433, 440 (C.A.A.F. 2001) (citation omitted). Once the proponent has shown a reasonable probability that the evidence is authentic, the evidence should be admitted "in spite of any issues the opponent has raised about flaws in the authentication." *United States v. Lubich*, 72 M.J. 170, 174 (C.A.A.F. 2013) (noting that any flaws go to the weight of the evidence, not its admissibility).

"There is no single way to authenticate evidence." *United States v. Holmquist*, 36 F.3d 154, 167 (1st Cir. 1994). "Thus, a document's 'appearance, contents, substance, internal patterns, or distinctive characteristics, taken in conjunction with circumstances,' can, in cumulation, even without direct testimony, provide sufficient indicia of reliability to permit a finding that is authentic." *Id.* (citations omitted).

**3. Analysis**

Appellant contends the military judge abused his discretion by admitting the five videos described *supra*. Appellant emphasizes RC testified that the SD card was not in her personal possession and that she did not record any of the

video clips, nor was she present when any of the video clips were recorded. Appellant further emphasizes that when she first viewed the SD card, she skimmed through the files because she claimed there were "tons" of files. Appellant argues that "heightened scrutiny for authentication of digitally[-]stored images is warranted by recent developments in technology that allow such images to be easily created and altered."

We do not find the military judge abused his discretion. We agree with the military judge that RC laid a sufficient foundation and authenticated the videos found in Prosecution Exhibits 5–9. She viewed enough of the recordings on the SD card to identify specifics about the people and location in the videos. She was able to use clues such as a clock, holiday decorations, age of children, and even a pacifier belonging to one of the children to determine the approximate timeframe of the recordings. She testified that the exhibits were a fair and accurate representation of what she saw on the SD card. Additionally, Special Agent JF supported RC's testimony that the exhibits were a fair and accurate representation of the version of the videos found in Appellant's SD card. We conclude the military judge's determination that RC's testimony satisfied the requirements of Mil. R. Evid. 901 was not clearly unreasonable or erroneous. However, assuming *arguendo* the military judge erred in admitting the videos, any error was not prejudicial. Appellant was acquitted of the offenses Prosecution Exhibit 5–9 were offered to support.[8]

### B. Mil. R. Evid. 404(b)

Appellant claims the military judge erred when he permitted the Government to prove the domestic abuse offenses with "impermissible propensity evidence." Specifically, Appellant argues the military judge erred in admitting into evidence uncharged acts of alleged violence under the theory of showing motive. Appellant claims the military judge abused his discretion by failing to apply the standard for establishing motive. He further avers that evidence of Appellant's prior acts of alleged violence towards RC when confronted with accusations of infidelity were "not relevant to motive" and instead inadmissible propensity evidence. We disagree and find no error, and even if there was error, we find no error that prejudiced Appellant. Therefore, no relief is warranted.

---

[8] Appellant claims he was prejudiced by admission of the videos stating the "inadmissible videos likely tipped the scales in the Government's favor" claiming the military judge took the exhibits to be material to Appellant's alleged motive. However, as discussed *infra*, the military judge focused on the act of RC confronting Appellant about his infidelity as relative to the motive, not the substance of the videos.

### 1. Additional Background

#### a. Government's Notice

Before trial, the Government provided the Defense with notice that it may offer evidence of Appellant's uncharged acts, pursuant to Mil. R. Evid. 404(b), related to the domestic violence offense. The Government's notice focused on three incidents where Appellant and RC had physical altercations after RC discovered evidence of Appellant's infidelity during their marriage.[9] The Government intended to offer this evidence to show Appellant's intent, motive, plan, and common scheme to abuse RC.

The Government's notice stated:

> [(a)] In approximately March 2018, while driving, [Appellant] grabbed [RC]'s head with his hand and slammed her head into the vehicle window when she tried to grab his phone. [Appellant] struck her mouth with his hand. When [RC] got out of the vehicle, [Appellant] moved her back into the vehicle, punched the rearview window, and told her, "You are just f[**]king making it worse, stop."

> [(b)] On or about 20 August 2018, [Appellant] grabbed [RC]'s neck with his hand and she could not breathe. He let go and punched [a picture] frame, shattering it.

> [(c)] On or about 30 June 2021, when [Appellant] found out [RC] had his SD card, he smashed her phone and destroyed her military [CAC].

#### b. Motion in Limine

The Defense filed a motion *in limine* requesting the military judge exclude the noticed evidence. The Government responded to the motion and requested an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing on the matter. Over the course of the motion hearing the military judge received evidence and heard arguments on the noticed evidence.

During the motion hearing, the Defense called one witness, RC, who at this time was Appellant's ex-wife. RC testified that in March 2018, she was driving

---

[9] In addition to giving notice regarding the incidents between Appellant and RC, the Government's notice also addressed uncharged physical assaults by Appellant against two other women; however, the military judge granted the Defense's motion *in limine* in part because he excluded any evidence of the other two women unless the Defense "open[ed] the door to such evidence."

in the car with Appellant and her son, when a Bluetooth notice showed up on the car's front screen with a "flirty" text message from a female name RC recognized. RC tried to retrieve Appellant's phone; however, Appellant, while driving, pushed her back from his phone and hit her head against the windshield. RC opened the door to get out, and Appellant swerved the car to a gravel area on the side of the road. RC exited the vehicle and tried to get her son out of the back seat. At this point, Appellant got out of the car and forced her back inside. RC kept crying and sat on the floor of the car's passenger seat. Appellant told her she was "making it worse" and punched the rearview mirror, shattering it completely and cracking the windshield. Once they got home, RC took a shower and laid down on her bed. Appellant stopped by the room, rubbed her head, and left the room. RC did not report the incident, nor seek medical treatment. RC eventually reported the incident to OSI during her 2021 interview regarding the videos on Appellant's SD card.

RC also testified about an "Anniversary Incident," which took place in August 2018. As it was their anniversary, RC bought Appellant a picture frame that she had arranged with a collage of photos from their first year together. As RC was grilling steaks for dinner, Appellant went outside to mow the lawn. RC took Appellant's phone to retrieve a particular photo of them and noticed he had an album on his phone that she was unfamiliar with titled, "What's App." When she clicked on it, there was a female she recognized as the one that had texted Appellant during the March 2018 incident. She went on to find naked pictures of this particular female in the "What's App" folder. Appellant came inside and noticed his phone was not where he left it and began looking for RC, who was hiding in the closet at this point.

RC told Appellant she was leaving and Appellant grabbed her and pinned her against the wall. RC testified that she could not breathe for a few seconds and she was holding his hand to indicate, "[L]et go of me." She stated that her son started yelling so Appellant let go of RC and went over to the frame he had just put on the wall and punched it causing it to shatter. He also began breaking other items in the house.

RC grabbed her son and they left the house. RC went on to explain that her son would talk about this incident after the fact, but she and Appellant would "act like nothing had happened and what [they] were doing was normal behavior." RC admitted that she never reported the incident to law enforcement, nor did she make any statements to friends or family. She recalled texting Appellant after this incident and asking for a divorce.

In addition to RC's testimony, the military judge also watched recordings of RC's law enforcement interview where she described the prior alleged acts.

### c. Military Judge's Ruling

After hearing oral arguments on the Mil. R. Evid. 404(b) motion, the military judge allowed testimony regarding the car and anniversary incidents to come in as "motive evidence." Specifically, the military judge found the incidents were admissible under Mil. R. Evid. 404(b) to "show [Appellant's] motive – that is when confronted by his wife with evidence of infidelity, [Appellant] reacts or responds with physical violence."[10]

The military judge provided an 18-page written ruling, in which he addressed the *Barnett* and *Reynolds* factors[11] as they related to the uncharged misconduct involving Appellant and RC and determined they weighed in favor of the Government.[12] *See United States v. Barnett*, 63 M.J. 388, 395–96 (C.A.A.F. 2006); *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989). In his *Barnett* factors analysis, the military judge addressed the probative value of the Mil. R. Evid. 404(b) evidence, providing his rationale for why the value of admitting this evidence was "high." He stated that the March and August 2018 incidents show a very specific result from Appellant (physical violence) to a very specific trigger (confronted with evidence of infidelity) and both the trigger and the response are present at the time of the charged offenses.

---

[10] The military judge did not agree with the Government's theories of admissibility involving a "plan" or "intent" to control or dominate RC.

[11] In *United States v. Reynolds*, our superior court held that when looking to evidence of uncharged misconduct, we must test its admissibility under at least three standards: (1) whether "the evidence reasonably support a finding [by the factfinder] that appellant committed prior crimes, wrongs, or acts;" (2) what "fact . . . of consequence is made more or less probable by the existence of this evidence;" and (3) whether "the probative value [is] substantially outweighed by the danger of unfair prejudice." 29 M.J. 105, 109 (C.M.A. 1989) (omission in original) (citations omitted). "If the evidence fails to meet any one of these three standards, it is inadmissible." *Id.* In *United States v. Barnett*, the court reaffirmed the three-part test and refined its application by requiring careful articulation of the second and third prong of *Reynolds*. As to the second prong, it looked to "whether the factual dissimilarities between offenses charged at trial and the prior uncharged misconduct were so great such that [a] military judge abused his discretion," and as to the third prong, "assuming the prior uncharged misconduct is logically relevant . . . whether any unfair prejudice created by the evidence outweighed its probative value." 63 M.J. 388, 394–95 (C.A.A.F. 2006).

[12] Appellant claims the military judge abused his discretion by failing to establish the second and third prongs of the *Reynolds* test. While the military judge's ruling did not specifically state the second and third prongs of the *Reynolds* test were met in regards to RC by referring to "Reynolds" when addressing them in his opinion, the military judge did conduct an analysis of the content of those prongs, and applied *Barnett*.

The military judge addressed why he found the uncharged conduct permissible under the Government's theory of motive. He explained that "'motive' is something, especially a willful desire, that leads one to act." The military judge relied on *United States v. Watkins* to address how evidence of motive "is relevant within the meaning of [Mil. R. Evid.] 401 to show the doing of an act by a person as an outlet for that emotion." 21 M.J. 224, 227 (C.M.A. 1986) (citing 1A Wigmore, *Evidence* § 117 (Tillers rev. 1983)); *see also id.* (citing 2 Wigmore, *Evidence* §§ 396, 397 (Chadbourn rev. 1979)) (recognizing that prior conduct "reasonably reflects" hostility towards women, particularly when coupled with intoxication, and therefore may be admissible to establish motive in the charged offense where intoxication prior to the offense was also at issue)) (additional citations omitted).[13]

Similarly, in the case in hand, the military judge recognized Appellant's prior conduct must be the type that reasonably could be viewed as the expression and effect of the existing internal emotion and this same motive must be shown to have existed in Appellant at the time of the subsequently charged acts. *Id*. He stated that the common thread among the physical assaults is that they came in response to RC confronting the Appellant in some way about his infidelity. The military judge went on to say that he would allow the evidence for the "limited purpose to show that when confronted with a very specific trigger from his wife (i.e., evidence of infidelity), the [Appellant] reacts in a very specific way – with physical violence." He further stated the evidence is probative to a material issue in this case, that it is more likely Appellant committed domestic violence against RC on 30 June 2021.

> As shown by the evidence on that date, and immediately prior to the charged domestic violence, RC confronted [Appellant] with the SD card that showed his infidelity. RC's confrontation, as it had on two prior occasions, resulted in Appellant physically assaulting her and violently damaging nearby property.

The military judge went on to state:

> To be clear, I am not allowing this evidence simply to show [Appellant] is a bad person who cheats on his wife, or that he is generally a mean and violent man. Instead, I will allow the evidence for the limited purpose to show that when confronted with a very

---

[13] The court in *Watkins* further cited 1A Wigmore, Evidence § 117, and 2 Wigmore, Evidence § 395, to support that "prior acts must be the type which reasonably could be viewed as 'the expression and effect of the existing internal emotion'" that existed at the time of the subsequently charged acts.

specific trigger from his wife (i.e., evidence of infidelity), Appellant reacts in a very specific way – with physical violence.

Regarding Appellant's uncharged acts of smashing the phone and shredding the military CAC, the military judge determined those acts were *res gestae* of the charged offense. However, the military judge found to the extent the phone smashing and shredding of the CAC falls under Mil. R. Evid. 404(b), such evidence also passes the *Reynolds* test.

**2. Law**

We review a military judge's Mil. R. Evid. 404(b) ruling for an abuse of discretion. *United States v. Wilson*, 84 M.J. 383, 390 (C.A.A.F. 2024). When we apply the abuse of discretion standard, mere disagreement with the conclusion of the military judge is not enough to overturn his decision. *United States v. Dooley*, 61 M.J. 258, 262 (C.A.A.F. 2005). Instead, we determine whether the military judge was clearly wrong in his determination of the facts or that his decision was influenced by an erroneous view of the law. *Id.* "[T]he abuse of discretion standard of review recognizes that a judge has a wide range of choices and will not be reversed so long as the decision remains within that range." *Wilson*, 84 M.J. at 390–91 (alteration in original) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J.120, 130 (C.A.A.F. 2000) (citations omitted).

Mil. R. Evid. 404(b)(1) provides that evidence of a crime, wrong, or other act by a person is generally not admissible as evidence of the person's character in order to show criminal propensity, *i.e.*, that the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for other purposes, including, *inter alia*, proving motive, opportunity, intent, plan, the absence of mistake, or lack of accident. Mil. R. Evid. 404(b)(2).

We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b):

> 1. Does the evidence reasonably support a finding by the [factfinder] that [an] appellant committed prior crimes, wrongs or acts?
>
> 2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?

> 3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*Hyppolite*, 79 M.J. at 162 (omissions in original) (quoting *Reynolds*, 29 M.J. at 109) (additional citations omitted).

If the admitted evidence fails to meet any of the factors laid out in *Reynolds*, the military judge will have erred. *Wilson*, 84 M.J. at 390 (citing *Reynolds*, 29 M.J. at 109). The appellate court must then assess the prejudice, if any, resulting from that error. *Id.* (citation omitted).

An appellate court will not reverse an appellant's conviction for harmless error. By this standard, "A finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Article 59(a), UCMJ, 10 U.S.C. § 859(a).

Whether an error is harmless is a question of law we review de novo. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (citation omitted). "For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *Id.* (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). "We evaluate the harmlessness of an evidentiary ruling by weighing: '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'" *Id.* at 89 (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

Mil. R. Evid. 404(b) "is a rule 'of inclusion rather than exclusion'" that "permits admission of relevant evidence of other crimes or acts unless the evidence 'tends to prove only criminal disposition.'" *United States v. Browning*, 54 M.J. 1, 6 (C.A.A.F. 2000) (quoting *United States v. Simon*, 767 F.2d 524, 526 (8th Cir. 1985)). Prior acts showing motive "must be the type which reasonably could be viewed as 'the expression and effect of the existing internal emotion'" and "this same motive must be shown to have existed in appellant at the time of the subsequently charged acts." *Watkins*, 21 M.J. at 227 (citation omitted).

"Motive" is defined as "something, especially willful desire, that leads one to act." *Motive*, BLACK'S LAW DICTIONARY (11th ed. 2019). "Motive evidence" is circumstantial proof that "shows the doing of an act by a particular person by evidencing an emotional need in that person which could have incited or stimulated that person to do that act in satisfaction of that emotion." *United States v. Whitner*, 51 M.J. 457, 461 (C.A.A.F. 1999) (citations omitted).

"Military judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F.

2007) (citation omitted). In particular, we further presume military judges are "capable of filtering out inadmissible evidence." *United States v. Robbins*, 52 M.J. 455, 457 (C.A.A.F. 2000).

"Evidence of uncharged misconduct is impermissible for the purpose of showing a predisposition toward crime or criminal character." *Id.* (footnote omitted). "However, uncharged misconduct can be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* (footnote and internal quotation marks omitted). "Evidence may be admissible for some purposes but not others." *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citation omitted). Mil. R. Evid. 404(b) "is viewed as an inclusionary rule under which evidence of logically relevant prior acts is admissible except when tending to prove only criminal disposition." *United States v. Franklin*, 35 M.J. 311, 316 (C.M.A. 1992) (internal quotation marks and citation omitted). Regarding the third *Reynolds* factor, the danger of unfair prejudice is precipitously less in a military judge alone trial when a military judge "emphasized that he would consider the uncharged acts only for the limited purpose of establishing a common scheme or plan and not as improper propensity evidence or for any purpose prohibited by [Mil. R. Evid.] 404(b)." *United States v. Greene-Watson*, 85 M.J. 340, 348 (C.A.A.F. 2025) ; *see also id.* at 349 (Sparks, J., concurring in part and in the judgment) ("The risk of relevant evidence causing unfair prejudice in a bench trial is nonexistent because the risk addressed in [*United States v. Staton,* 69 M.J. 228 (C.A.A.F. 2010), *i.e.*, that a lay trier of fact will treat evidence of uncharged acts as propensity evidence,] is eliminated by the absence of a members panel.").

### 3. Analysis

Appellant contends the military judge abused his discretion by allowing RC to testify to the three episodes of uncharged misconduct – the driving incident, the anniversary incident, and the phone smashing and CAC card incident. In doing so, Appellant claims the military judge "allow[ed] the Government to present evidence of Appellant's alleged propensity to respond to RC with violence when confronted with accusations of infidelity." For the reasons stated below, we do not find that the military judge abused his discretion in admitting the challenged evidence. The military judge provided a detailed written analysis in this case. As such, "the military judge's ruling is entitled to full deference by this court under the abuse of discretion standard." *Id.* (citation omitted). The military judge conducted a *Reynolds* factor analysis. The military judge was not clearly wrong in his determination of the facts, and his decision

was not influenced by an erroneous view of the law, particularly in the context of this judge-alone trial.

### a. Relevance to Motive

The military judge properly determined that the evidence reasonably supported a finding that the uncharged acts took place, satisfying the first *Reynolds* factor.[14] In regard to the second *Reynolds* factor, whether the evidence of the uncharged acts makes a fact of consequence more or less probable, Appellant argues that the military judge failed to apply the standard for establishing the uncharged acts as relevant to "motive." The military judge first articulated a detailed review of applicable precedent regarding evidence of motive under Mil. R. Evid. 404(b). He reasoned that the uncharged acts were admissible under Mil. R. Evid. 404(b) because they demonstrated Appellant had a motive to commit the charged misconduct. He then applied the definition of "motive" as referenced in Black's Law Dictionary to be "something, especially willful desire that leads one to act," citing *Motive*, BLACK'S LAW DICTIONARY (7th ed. 1999). The military judge accurately explained that "the common thread in all physical assaults alleged by RC is that they came in response to her confronting [Appellant] in some way about his infidelity." In March 2018, RC saw that Appellant was receiving text messages from a female and when she confronted Appellant, he reacted with physical violence by "pushing her head into the window, forcing her back in the car and smashing the rearview mirror of the car." In August 2018, when RC confronted Appellant about evidence of infidelity she had discovered on his phone, Appellant again reacted with physical violence by "choking RC and then punching and shattering a nearby picture frame." The military judge pointed out that similar to the uncharged offenses, on the night of the charged offense of 30 June 2021, RC confronted Appellant about evidence of infidelity she had discovered on the SD card, and Appellant reacted with physical violence by punching RC in the ribcage with his fist and smashing her phone.

We find that the military judge did not have an erroneous view of the law by applying *Watkins* to determine that Appellant's uncharged acts of violence after similarly being confronted about infidelity could reasonably be viewed as "the expression and effect" of the existing internal emotion that existed in Appellant at the time of the subsequently charged act, and therefore are relevant to Appellant's motive, within the meaning of Mil. R. Evid. 401. *Watkins*, 21 M.J. at 227. While the military judge did not name the specific emotion in his

---

[14] We note "[t]he standard to meet this prong is low." *Wilson*, 84 M.J. at 390 (quoting *United States v. Thompson*, 63 M.J. 228, 230 (C.A.A.F. 2006)).

ruling, in applying *Watkins*, we can infer the military judge determined Appellant's past confrontations of infidelity created hostile emotions which were expressed as physical violence towards RC. Physical violence can reasonably be viewed as the "expression and effect" of an emotional response due to being confronted with infidelity. The military judge captured this idea when he said, "[W]hen confronted with a very specific trigger from his wife (i.e., evidence of infidelity), the [Appellant] reacts in a very specific way – with physical violence." *See Watkins*, 21 M.J. at 227 *(*holding that an appellant's prior violent acts are reasonably the "expression and effect" of an appellant's existing internal emotion). Additionally, the military judge's ruling clearly indicated he was not admitting the evidence for purposes of propensity as he would not use the evidence to consider Appellant "a bad person who cheats on his wife, or that he is generally a mean and violent man." He further determined that the probative value of the evidence was very high and not substantially outweighed by the danger of unfair prejudice as part of his Mil. R. Evid. 404(b) and Mil. R. Evid. 403 analyses.

Upon reviewing the military judge's analysis, there is no clear evidence that the military judge failed to follow the law. *See Erickson*, 65 M.J. at 225 (noting military judges are presumed to know the law and to follow it, absent clear evidence to the contrary*)*. Therefore, we find the military judge's decision to admit evidence of uncharged acts testimony pursuant to Mil. R. Evid. 404(b) was not "arbitrary, fanciful, clearly unreasonable or 'clearly erroneous.'" *Collier*, 67 M.J. at 353 (citation omitted). As such, the military judge did not abuse his discretion in allowing the evidence to be admitted. Furthermore, we give substantial deference to the military judge's Mil. R. Evid. 403 balancing test. Additionally, because this was a judge alone trial, where the military judge made a point to distinguish propensity evidence from motive evidence, there was even less danger of the evidence being used for any improper purpose. In coming to this conclusion, we are mindful of our superior court's admonition in *Wilson*, et al., to be on guard against "the wolf of propensity that comes dressed in the sheep's clothing of motive," and under somewhat different circumstances we would not be persuaded there was no error. *See Wilson*, 84 M.J. at 392–93 (citing *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009)) (describing evidence improperly admitted under Federal Rule of Evidence 404(b) as "propensity evidence in sheep's clothing"). However, here, the military judge's analysis laid out in his 18-page ruling, combined with his stated limited use of this evidence, led us to determine the military judge's distinction between propensity and motive evidence fell within the broad discretion vested in military judges. Furthermore, as we explain more fully below, any error was harmless.

### b. Lack of Prejudice

Assuming *arguendo* the military judge abused his discretion by admitting evidence of the prior violent acts involving RC, reversal is warranted only if the error materially prejudiced the Appellant's substantial rights under Article 59 (a), UCMJ, a determination we make using the factors articulated in *Kerr*.

Appellant argues the evidence prejudiced his trial, pointing out that the trial counsel referred to the uncharged acts during his closing argument by stating, "Similar to the two instances in 2018, here we have [Appellant] being confronted with some form of proof or suspicion of infidelity . . . ." Appellant points out that the Government also argued, "But the facts are what they are. [Appellant] beat [RC] that day. Just like he has done in the past."

Applying the *Kerr* factors, we are not persuaded any error had a substantial influence on the findings. *See Bowen*, 76 M.J. at 87 (quoting *Kerr*, 51 M.J. at 405). Conducting a de novo review of whether any error was harmless, and applying the four-prong test laid out in *Bowen*, we find any error in admitting the evidence of the prior uncharged acts of physical violence against RC was harmless. We evaluate prejudice from an erroneous ruling by weighing "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of evidence in question, and (4) the quality of the evidence in question." *Bowen*, 76 M.J at 89 (quoting *Kerr*, 51 M.J. at 405).

The Government had a strong case notwithstanding the testimony of the prior, uncharged, violent acts involving RC. Evidence of the charged conduct was established by other evidence at trial, particularly RC's testimony. In addition to reviewing the transcript, this court listened to the audio recordings of the trial, and finds RC to be a credible witness. She had a valid explanation as to why she initially denied the domestic violence. RC knew that if she reported the domestic violence it would have halted Appellant's deployment, and she felt it was best for him to leave on his deployment. She explained she did not end her marriage earlier because her son, PC, had a relationship with Appellant. While the Defense presented evidence from Appellant to contradict RC, as stated *infra*, RC's testimony was better supported by multiple witnesses involved in responding to the events of 30 June 2021. GG's testimony confirmed there was an altercation between Appellant and RC on 30 June 2021. She confirmed that Appellant did not allow GG to talk to RC. As a result, GG contacted her local OSI detachment and requested a health and wellness check. Furthermore, in regard to the CAC, Appellant testified under oath that he did not destroy or cut RC's CAC. However, multiple witnesses corroborated RC's testimony that her CAC was destroyed. GG testified that she helped RC plan to access the base the next day because her CAC was inoperable, and a non-

commissioned officer authenticated documents showing RC obtained a new CAC the day after the offense. The fact RC needed a new CAC corroborated her testimony and timeline of events and supported her claim that Appellant was upset that RC had found the SD card and Appellant destroyed her CAC because she would not turn over the SD card.

As to materiality, RC's testimony regarding Appellant's prior physical altercations was material to the Government's overall case to show motive. As the military judge described in his ruling,

> This evidence is probative to a material issue . . . specifically, it makes it more likely [Appellant] committed domestic violence against RC on 30 June 2021. As shown by the evidence, on that date, and immediately prior to the charged domestic violence, RC confronted [Appellant] with the SD card that showed his infidelity. RC's confrontation, as it had on two prior occasions, resulted in [Appellant] physically assaulting her and violently damaging nearby property.

Even where evidence is material, the remaining *Kerr* factors demonstrate that the error did not materially prejudice Appellant. *See Kerr*, 51 M.J. at 405 (determining admission of extrinsic evidence of misconduct was harmless error when Government's evidence was strong, defense case was not as strong, evidence was material, and evidence was of "questionable credibility").

Turning to the fourth factor, the quality of RC's testimony to Appellant's prior violent acts was not particularly high, having taken place nearly three years prior to the charged offense, and not corroborated by any other witnesses. Therefore, three out of four factors of the *Kerr* test weigh in favor of finding no prejudice.

Even though trial counsel referred to the evidence in their closing argument, in the context of the trial as a whole, the *Kerr* factors demonstrate that the evidence played, at most, a minimal role in the Government's case. As such, the evidence would not have a meaningful influence on the verdict, given the strength of the other admitted evidence and limited quality of the challenged material. Therefore, in applying the *Kerr* factors, three of the four factors weigh in the Government's favor and the admission of RC's testimony about Appellant's prior violent acts when confronted by the military judge, if error, was harmless. *See United States v. Norman*, 74 M.J. 144, 150 (C.A.A.F. 2015) (holding error in admitting opinion testimony on an ultimate issue was not prejudicial when three out of four *Kerr* factors weighed in favor of the Government).

In light of the totality of the evidence in this case, we are not persuaded RC's testimony regarding the prior uncharged violent acts had a substantial effect on the findings.

## C. Factual and Legal Sufficiency of Domestic Violence Conviction

Appellant contends his conviction for domestic violence was factually and legally insufficient. Specifically, he argues the Government's case was factually insufficient because it relied primarily on the testimony of RC, which Appellant describes as not credible because RC had initially "denied on body camera that any domestic violence took place." In terms of legal sufficiency, Appellant claims that no reasonable factfinder could have concluded that the offense occurred. Upon review of the record, we find Appellant's conviction for domestic violence factually and legally sufficient.

### 1. Additional Background

During trial, RC explained she did not initially tell the responding police officers that Appellant had committed domestic violence against her because she wanted to protect Appellant. She testified that she believed making such an allegation might ruin Appellant's career, prevent him from getting promoted, and interfere with his upcoming deployment which she considered the "best thing . . . to give [them] space but to also not hurt him."

The Government also offered supporting testimony from GG, who was on the phone with RC during the time of the violent act. GG explained how she arranged for police to conduct a health and welfare check at Appellant and RC's home based on her concerns about what she heard during that phone call. GG further testified, "I wanted law enforcement to figure . . . out [what happened] and respond in case she was hurt or something happened."

GG then told the military judge of her interactions with RC after the incident. GG spoke with RC about how to get on the base the day after the incident because RC's CAC was not serviceable. She explained that RC told her more about what happened between her and Appellant in "pieces." GG also attested to RC's character for truthfulness.

Appellant, for his part, also provided sworn testimony at trial, denying all of RC's allegations. When asked by his trial defense counsel whether "[he] ever commit[ted] assault consummated by a battery against [RC]" on 30 June 2021, Appellant answered, "No, sir."

Appellant provided his side of the account of the convicted offense. Appellant stated he was at a deployment-related appointment when he contacted RC to ask whether she had seen a document he had left at the house. According to

Appellant, RC agreed to look for it, and he later received a text message from her stating, "[Y]ou piece of sh[*]t." He testified he then called RC, who told him she had found a SD card containing videos. He claimed he was "shocked" and "a little embarrassed" because he "got caught cheating" and "[t]here was an SD card out for her to see." "It contained files of other women . . . ."

Appellant described driving home and discovering that the front door was locked. When he attempted to unlock it using the combination, it did not work. He then went to the backyard, where he found the sliding glass doors locked as well. He explained he was able to open the sliding door by lifting one side and sliding it over. He denied breaking any lock to get in. Once inside the house, he began searching for his SD card while RC followed him from room to room while talking on the phone to GG. He told RC to get off the phone as he did not want "[his] business out there."

Appellant's version of how he got the phone differs from RC's testimony. Where RC claimed she released the phone when he punched her in the ribs with his fist, Appellant claims he grabbed the phone from her "straight out of her hands" and held it above his head so she "couldn't grab it," implying they were both standing up. He claimed there was no injury to her from grabbing the phone. He testified he did not push RC, cause her to fall, or strike her in the ribs to obtain her phone.

Similar to RC's testimony, Appellant described how GG kept calling back and he eventually answered it. When GG threatened to call the police if she could not talk to RC, he claimed he told her, "[D]o what the f[**]k you got to do" and hung up. Appellant testified that he continued to look around the house for the SD card and within minutes, law enforcement knocked on the door claiming they received a call regarding a domestic violence dispute. Appellant testified that both he and RC told them that it was a verbal dispute and no property was damaged and no one was hit. Appellant claimed he and RC agreed that he would leave the residence for the night.

Trial defense counsel asked Appellant if RC's son PC was around during this dispute. Appellant testified that PC was home in his room but came out when he heard the argument and he saw Appellant holding RC's phone over his head. Appellant said he told PC to go back in his room and PC complied.

Appellant testified that within 24 hours of this incident, he was back at his house at RC's invitation. Appellant claimed that RC invited him to come over and spend time with PC before he left on his deployment.

Additionally, Appellant testified about the uncharged allegations of violence against RC which were part of the Mil. R. Evid. 404(b) evidence discussed

*supra.* He agreed with his trial defense counsel on direct examination that he "never once laid hands on [RC]." He agreed with his trial defense counsel that PC was present during the alleged altercations and that he would not violently interact with a woman in front of a child. When his counsel asked him why he would not be violent in front of a child, Appellant explained:

> First of all it's not what I do. I know little man's watching me. I'm not saying kid's [sic] talk, but, you know, I wouldn't want to do that at all. Set myself up for failure.

Appellant further testified that filing for divorce during his deployment made RC "kind of upset" and that RC threatened to turn in the SD card to his squadron or OSI and told him "[his] career was ending."

Appellant denied destroying or cutting RC's CAC. At trial, the non-commissioned officer in charge of customer support at Luke AFB, testified that records showed RC replaced her CAC on 1 July 2021, the day after the charged offense, but indicated that her office did not have any record of why or how RC's card was damaged.

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

Factual sufficiency review is triggered only if an appellant (1) asserts it as an assignment of error, and (2) shows a specific deficiency in proof. *United States v. Harvey*, 85 M.J. 127, 130 (C.A.A.F. 2024) (citing Article 66(d)(1)(B)(i), UCMJ, 10 U.S.C. § 866(d)(1)(B)(i), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)).

The current version of Article 66(d)(1), UCMJ, states:

> (B) FACTUAL SUFFICIENCY REVIEW. –
>
> > (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.
> >
> > (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>
> (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

This factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. *See* National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3388, 3612–13 (2021).

If both thresholds are met, this court may "weigh the evidence and determine controverted questions of fact." Article 66(d)(1)(B)(ii), UCMJ. We do so keeping in mind that a factfinder may choose to believe one part of a witness's testimony and disbelieve another. *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979).

We must give "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence." *Harvey*, 85 M.J. at 130. "[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Id.* (second and third alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.*

The CCA must be "clearly convinced that the finding of guilty was against the weight of the evidence" before they may "dismiss, set aside, or modify the finding, or affirm a lesser finding." Article 66(d)(1)(B)(iii), UCMJ, 10 U.S.C. § 866(d)(1)(B)(iii). "[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Harvey*, 85 M.J. at 131 (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding[s] of guilty [were] against the weight of the evidence,' two requirements must be met." *Id.* at 132. First, we must decide that evidence, as we weighed it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we "must be clearly convinced of the correctness of this decision." *Id.*

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). This "does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

Article 128b, UCMJ, criminalizes violent offenses against a spouse, intimate partner, or immediate family member of that person, otherwise known as domestic violence. Article 128b(1)–(5), UCMJ, 10 U.S.C. § 928b(1)–(5).

As charged in this case, to find Appellant guilty of domestic violence, in violation of Article 128b, UCMJ, the Government was required to prove beyond a reasonable doubt: (1) that Appellant committed a violent offense, to wit: unlawfully struck RC's ribcage with his fists, and (2) that the violent offense was committed against RC, the spouse of Appellant. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), App. 2, at A2-45–46.[15] As part of this offense, the underlying violent offense was assault consummated by a battery. To find Appellant guilty of assault consummated by a battery, in violation of Article 128, UCMJ, 10 U.S.C. § 928, the Government was also required to prove beyond a reasonable doubt: (1) that Appellant did bodily harm to RC by unlawfully striking RC's ribcage with his fists, (2) that the bodily harm was done unlawfully, and (3) that the bodily harm was done with force or violence. *MCM*, pt. IV, ¶ 77.b.(2)(a)–(c).[16]

---

[15] On 26 January 2022, the President signed an executive order which amended certain provisions of the Manual for Courts-Martial, to include a new paragraph 78a of the Uniform Code of Military Justice—Article 128b, UCMJ, *Domestic Violence*—outlining, *inter alia*, the elements of the offense and maximum punishments to be imposed. *See* Exec. Order No. 14,062, 3 C.F.R. 4763 (31 Jan. 2022).

[16] The military judge found Appellant guilty of the charged offense of domestic violence but excepted the words "fists" and substituted therefor the word "fist." Of the excepted word, the military judge found Appellant not guilty, of the substituted word, guilty. This does not change our analysis.

### 3. Analysis

We find Appellant has adequately asserted factual insufficiency as an assignment of error. *See* Article 66(d)(1)(B)(i), UCMJ. Appellant has shown a specific deficiency in proof given his claim that RC initially denied that domestic violence had occurred. Appellant has also highlighted a second specific deficiency in proof in Appellant's testimony denying that he assaulted RC. *See id.*

Therefore, we have "weigh[ed] the evidence and determine[d] controverted questions of fact." Article 66(d)(1)(B)(ii), UCMJ. We have also given "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence." *Harvey*, 85 M.J. at 130. By this standard, we are not "clearly convinced that the finding of guilty was against the weight of the evidence." Article 66(d)(1)(B)(iii), UCMJ; *Harvey*, 85 M.J. at 130.

RC testified and described several reasonable explanations for denying the abuse when the police showed up to her house. She explained she was trying to protect herself from Appellant and believed reporting domestic violence would prevent Appellant from deploying as planned, an event she believed would guarantee six months apart from him. She also believed that if she had reported it, she would not have the strength to take the next steps to come forward or testify about the abuse and Appellant would have ended up being released anyway. RC claimed that if she reported it, she felt she would be back in the same situation, whereas the deployment gave them space.

Additionally, the Government provided other evidence that weighed in their favor. GG's testimony confirmed there was an altercation between Appellant and RC, which caused GG enough concern to request police support and contact a mutual friend to assist RC. GG's testimony tended to support RC's testimony that RC became upset with Appellant after finding the SD card with videos of him having sex with other women. GG's testimony also supported RC's allegation that Appellant would not let GG talk with RC after their phone call was disconnected. Furthermore, GG testified about helping RC think through options to get on base the next day without her CAC, which gave further support to RC's allegation that Appellant had destroyed the card on the night of the convicted offense. In light of this trial evidence, there was a reasonable basis to find RC credible given her testimony and corroborating evidence.

Turning to the conflicting testimony between RC and Appellant at trial, this case boiled down to a determination of witness credibility. The military judge, unlike this court, had the opportunity to observe both Appellant and RC testify and to receive the other trial evidence firsthand. We give the military judge appropriate deference to the fact that he saw and heard the witnesses

and other evidence. *Harvey*, 85 M.J. at 130. While Appellant had witnesses testify on his behalf, not one witness corroborated his side of the testimony as it related to the domestic violence charge and specification. The Government called GG to testify about her concerns which rose to the level of involving the police. BM testified about taking PC from the house as the police arrived. MSgt SS testified about staying with RC for a while that evening. If it was merely a verbal altercation, it seems unlikely RC would want her son to leave the house, and that she would need a senior non-commissioned officer to stay with her for a while that evening. Her testimony is further corroborated by evidence that RC tried to get a new CAC the next day, which is unlikely if her prior CAC was not destroyed. This is not to say the military judge discounted Appellant's credibility in full. While the military judge found Appellant guilty of the violent act against RC, he likely gave some weight to Appellant's explanation for the alleged offenses of which he was acquitted.[17] We are convinced beyond a reasonable doubt of Appellant's guilt. The weight of the evidence supported the domestic violence conviction which we find factually sufficient. *See* Article 66(d)(1)(B)(iii), UCMJ.

Turning to the issue of legal sufficiency, after considering the evidence presented at trial in the light most favorable to the Government, including our resolution of credibility disputes, we conclude any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Accordingly, we find Appellant's conviction is legally sufficient and he is not entitled to relief.

## D. Article 13, UCMJ, Credit for Pretrial Confinement Conditions

Appellant claims he is entitled to relief for being confined under conditions more rigorous than necessary to ensure his presence at trial, in violation of Article 13, UCMJ, 10 U.S.C. § 813.

### 1. Additional Background

After the OSI had possession of the SD card and noticed several videos had children in them, they ran the names of the women in those specific videos through a database and made them "persons of interest" and alerted local authorities in Florida. In August 2022, while allegations by RC were pending, the State of Florida brought several charges against Appellant and issued an

---

[17] Appellant testified he intended to record himself engaging in consensual sex with the ladies in the video, but he did not intend for the children to be around while he was having sex with the woman in each video and he had not intended to conduct indecent exposure, communicate indecent language, or indecently record them.

arrest warrant for crimes allegedly committed against RD, a named child victim in this case. Those crimes dealt with evidence that Appellant recorded himself having sex with RD's mother while RD was in the vicinity and thereby captured RD in the sexually explicit video recording. On 8 September 2022, the United States Air Force (hereinafter Air Force) requested exclusive jurisdiction from the State of Florida for all offenses forming the charges in Appellant's court-martial and asked that the State "rescind the current arrest warrant against [Appellant]."

On 16 September 2022, a Florida assistant state attorney notified the Air Force that after discussions with the base legal office, they would "honor [their] request to relinquish jurisdiction for all charges related to [RD] and [Appellant]" and that they were "also taking action to rescind the current arrest warrant . . . ."

In his motion for relief, Appellant claims he had trouble accessing the base due to the outstanding arrest warrant for approximately one year. Specifically, as a result of this warrant, Appellant stated he was stopped at the gate "everyday [sic] for the next year." He claimed he spoke with his leadership about the warrant each week and was told that the Air Force had taken jurisdiction over the charges and the Florida warrant would be dropped soon. Air Force officials attempted to resolve the problem by reaching out to authorities in Florida. However, Florida continued to retain an active warrant against Appellant for the allegations of crimes against RD.

While Appellant was on leave in Nevada on 29 June 2023, he was stopped for an alleged traffic violation and was arrested and placed in a Nevada jail based on the warrant issued by the State of Florida. Appellant remained in custody in Nevada until 18 July 2023, when he was extradited to Florida where he was also held in confinement by Florida authorities. He was released from confinement in Florida on 21 July 2023. He spent a total of 22 days in a civilian confinement facility under the custody of two states.[18]

Trial defense counsel moved for appropriate relief for an alleged violation of Article 13, UCMJ, asserting that Appellant's conditions of pretrial confinement at the civilian confinement facilities were "more rigorous than necessary to ensure his presence at trial." During sentencing, Appellant asked for 30 days of pretrial confinement credit to account for the time he spent in civilian confinement and restriction to base. According to Appellant, while confined in

---

[18] Appellant was also restricted to base for 30 days in August 2022. Appellant's first sergeant testified that he was restricted to base for a lack of good order and discipline in the unit, his safety, and the safety of others in the unit. This restriction was lifted.

Nevada, he was "not permitted to go outside." He was "released from his cell only once every five days", "had a shower only every five days," and was kept in a cell with civilians where he had to wear a "jumpsuit" and "slept on the floor of the cell."

The military judge denied Appellant's motion, finding that confinement by civilian authorities "was solely related to the actions by the [S]tate of Florida" and that those actions "didn't have anything to do with the Air Force." Specifically, the military judge found in his written ruling:

> The United States was not involved in the issuance of the warrant, the failure to rescind such warrants, the enforcement of the warrants, nor the confinement in Las Vegas or Florida. Nonetheless, when [Appellant] kept getting stopped at the gate, Air Force officials attempted to resolve the problem by reaching out to authorities in Florida. Additionally[,] when [Appellant] was confined, the Government made efforts to resolve the situation.

The military judge also found in his verbal ruling:

> [T]he time spent in Nevada jail and Florida jail was completely unrelated to the offense which [Appellant] has been found guilty, which is domestic violence – or assault consummated by battery, violation of Article 128b, that took place in the state of Arizona. And so, given the confinement was not related to the offense of which [Appellant] accused was convicted, he is not entitled to pretrial confinement credit.

In a later written ruling, the military judge found Appellant would only be entitled to pretrial confinement credit under these circumstances if he had been convicted of the offenses which formed the basis of the charges in Florida.

### 2. Law

#### *a. Standard of Review*

Whether an appellant is entitled to relief for a violation of Article 13, UCMJ, is a mixed question of fact and law. *United States v. Crawford*, 62 M.J. 411, 414 (C.A.A.F. 2006) (citations omitted). "[T]he military judge's findings of fact will not be overturned unless they are clearly erroneous." *United States v. Fischer*, 61 M.J. 415, 418 (C.A.A.F. 2005) (citation omitted). "Whether the facts amount to a violation of Article 13, UCMJ, is a matter of law the court reviews de novo." *Crawford*, 62 M.J. at 414 (citation omitted). The appellant bears the burden to demonstrate a violation of Article 13, UCMJ. *Id.* (citation omitted).

A military judge's findings of fact are "clearly erroneous when there is no evidence to support the finding or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Criswell*, 78 M.J. 136, 141 (C.A.A.F. 2018) (citations omitted).

### b. Article 13, UCMJ

Article 13, UCMJ, provides, in the pertinent part: "[n]o person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence [at trial] . . . ."

"Article 13, UCMJ, prohibits two things: (1) the imposition of punishment prior to trial, and (2) conditions of arrest or pretrial confinement that are more rigorous than necessary to ensure the accused's presence for trial." *United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005).

To qualify as "rigorous" within the meaning of Article 13, UCMJ, the conditions must be "sufficiently egregious [to] give rise to a permissive inference that an accused is being punished, or the conditions . . . [were] so excessive as to constitute punishment." *Id.* at 227–28 (citations omitted) (holding solitary confinement in a six-by-six-foot windowless cell without any specific rationale was unduly rigorous). The United States Court of Appeals for the Armed Forces (CAAF) has previously explained that "genuine privations and hardship over an extended period of time" may rise to the level of a due process violation and warrant relief. *See United States v. Fricke*, 53 M.J. 149, 155 (C.A.A.F. 2000) (citations omitted) (holding that appellant's 326 days of pretrial confinement, where he was locked in his cell 23 hours a day and was required to sit or stand near a small wooden desk for 15-and-a-half hours to keep from falling asleep, raised a legal claim of unduly rigorous conditions in violation of Article 13, UCMJ).

Although R.C.M. 305(k) is the principal remedy for Article 13, UCMJ, violations, courts must consider other relief for violations of Article 13, UCMJ, where context warrants. *United States v. Zarbatany*, 70 M.J. 169, 175 (C.A.A.F. 2011). The CAAF case law recognizes that certain circumstances may warrant other relief for Article 13, UCMJ, violations and that relief may range from disapproval of a bad-conduct discharge to complete dismissal of the charges, depending on the circumstances. *Id.*; *see also United States v. Fulton*, 55 M.J. 88, 89–90 (C.A.A.F. 2001) (noting that dismissal of charges for illegal pretrial punishment is an extraordinary remedy but is permissible if any lesser remedy is not appropriate to address the severity of the illegal punishment).

### c. Civilian Authorities and Confinement

Where an appellant is confined by civilian authorities "for their own convenience" and not at the request of military authorities, he is not entitled to relief. *United States v. Harkins*, ACM No. 29200, 1992 CMR LEXIS 806, at *3 (A.F.C.M.R. 19 Nov.1992) (unpub. op.) (per curiam).

R.C.M. 305 is the rule that regulates pretrial confinement, and it "must be followed if a military member is confined by civilian authorities for a military offense and with the notice and approval of military authorities." *United States v. Lamb*, 47 M.J. 384, 385 (C.A.A.F. 1998).

"A [servicemember] tried by court-martial must be given sentence credit for time spent in pretrial custody by local civilian authorities in connection with the offense or acts solely for which a sentence to confinement by a court-martial is ultimately imposed." *United States v. Turk*, ARMY 20210104, 2022 CCA LEXIS 728, at *4 (A. Ct. Crim. App. 13 Dec. 2022) (unpub. op.) (quoting *United States v. Dave,* 31 M.J. 940, 942 (A.C.M.R. 1990)).

### d. Sentence Appropriateness

This court reviews issues of sentence appropriateness de novo. *See United States v. McAlhaney*, 83 M.J. 164, 166 (C.A.A.F. 2023) (citing *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006)). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *See United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

### 3. Analysis

### a. Article 13, UCMJ, Credit for Pretrial Confinement

Appellant claims he is entitled to relief after he was confined under conditions more rigorous than necessary to ensure his presence at trial under Article 13, UCMJ. Additionally, Appellant claims the military judge's determination that no credit could be awarded because of the distinction between the offenses listed on the Florida warrant (sexual abuse of a child) compared to the ones of which he was convicted (domestic violence) was erroneous. Appellant claims that the military judge "overlooked two crucial issues," arguing Article 13, UCMJ, embodies a "flexible approach to remedies, which may include more specific offenses, but also call for a more wholistic and equitable remedy

depending on the circumstances," citing *Zarbatany*, 70 M.J. at 175.[19] Appellant also argues that our court has broad authority to review sentence appropriateness under its Article 66, UCMJ, 10 U.S.C. § 866, authority. In response, the Government claims that there is no Article 13, UCMJ, issue because the United States was not involved in the issuance of the warrant that led to Appellant's confinement in Nevada and Florida.

The military judge's findings of fact were not "clearly erroneous" when he stated Appellant was placed into civilian confinement in Nevada and Florida as a result of arrest warrants issued by the State of Florida, not through any coordination conducted by the United States Government. *Lamb*, 47 M.J. at 385. The military judge went on to state that Appellant's pretrial confinement is not attributable to the United States, but rather the State of Florida. The military judge's findings were not clearly erroneous. *See Fisher*, 61 M.J. at 418 ("[T]he military judge's findings of fact will not be overturned unless they are clearly erroneous."). The Air Force did not request that state authorities issue a warrant for Appellant and confine him. Indeed, when the Air Force found out about Appellant's confinement, it took measures to resolve the situation. Furthermore, Appellant was not confined by any state for the offense for which he was ultimately convicted.

We do not find facts that amounted to a violation of Article 13, UCMJ, and the military judge did not err in his determination not to give Appellant credit under Article 13, UCMJ. Under the unique facts of this case, Appellant cannot seek redress in this court for the States' actions. We recognize the frustration this result may cause. Ultimately, this court is not a court of equity that can resolve the matter now on appeal because it would be *fair* to Appellant. *See United States v. Lopez*, 86 M.J. 139, No. 24-0226, 2025 CAAF LEXIS 735, at *21 (C.A.A.F. 2 Sep. 2025) (holding that Article 66(d)(2), UCMJ, does not turn service Courts of Criminal Appeals into courts of equity).

### b. *Appropriateness of Sentence*

Appellant submitted an alternative argument that Appellant's sentence was inappropriately severe for "failing to account for the unlawful confinement." Upon our review of the "all matters contained in the record of trial," we

---

[19] In *Zarbatany*, the CAAF found that when Article 13, UCMJ, relief is available, meaningful relief must be given. 70 M.J. at 175. However, relief is not warranted or required where it would be disproportionate to the harm suffered or the nature of the offense. *Id.* at 171.

find Appellant's sentence was appropriate for the charge and specification that he was convicted of.

During sentencing argument, the Government suggested, among other punishments, that Appellant receive a bad-conduct discharge, at least nine months in confinement, a reduction in grade to E-1, and total forfeitures. Trial defense counsel argued that "two months confinement and no punitive discharge is the appropriate sentence here" and specifically pointed out that Appellant spent "several weeks in civilian confinement" due to "essentially a clerical error."

Appellant was sentenced to be confined for 60 days.[20] He was not reduced in rank, nor did he receive a bad-conduct discharge. Based on our individual consideration of Appellant, his character, his service record, and the nature and seriousness of the offenses, we find the sentence, including the two months of confinement, is appropriate in this case.

### E. Post-Trial Delay

Appellant did not raise excessive post-trial delay in his briefing. Nevertheless, we review this issue because this court's decision on his appeal was not rendered within 18 months of docketing.

#### 1. Additional Background

The military judge sentenced Appellant on 3 November 2023 and signed the entry of judgment on 16 January 2024. On 15 July 2024, Appellant filed his notice of appeal, pursuant to Article 66(b)(1)(A), UCMJ, *see* n.1 *supra*, and this court docketed his case the same day.[21] Appellant later requested and received ten enlargements of time before he ultimately submitted his assignments of error brief on 17 July 2025. The Government submitted its answer on 18 August 2025. On 25 August 2025, Appellant filed a timely reply in response to the Government's answer.

#### 2. Law

---

[20] Appellant was also sentenced to forfeiture of $836.00 of pay per month for six months and a reprimand.

[21] This court did not receive the record of trial at the time of docketing. It ordered the Government to forward a copy to the court forthwith. The Government provided the record of trial with a verbatim transcript to this court on 26 July 2024.

We review de novo whether an appellant is entitled to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

In *Moreno,* the CAAF identified thresholds for facially unreasonable delay during the post-trial and appellate process when: (1) the convening authority did not take action within 120 days of the completion of trial, (2) the record was not docketed with the CCA within 30 days of the convening authority's action, an (3) the CCA did not render a decision within 18 months of docketing. 63 M.J. at 142–43.

When there is a facially unreasonable delay in an appellant's case, we determine whether to grant relief by examining four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) [whether there was any cognizable] prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted).

There are three types of cognizable prejudice in this context: (1) oppressive incarceration; (2) "particularized" anxiety or concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (footnotes and citations omitted). The last is most serious because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

In cases where an appellant has not shown prejudice, we cannot find a due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Even when there is no due process violation, this court may still provide appropriate relief to an appellant, pursuant to Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2), when there was "excessive delay in the processing of the court-martial after the judgment was entered into the record." *United States v. Valentin-Andino*, 85 M.J. 361, 364 (C.A.A.F. 2025).

Such relief "must be suitable considering the facts and circumstances surrounding that case." *Valentin-Andino*, 85 M.J. at 367. A CCA is not obligated to provide "objectively meaningful" relief or "explain its reasoning" for any relief it provides. *Id.*

**3. Analysis**

In Appellant's case, more than 18 months have elapsed since Appellant's case was docketed with this court. This is a facially unreasonable delay by almost two months over the 18-month threshold. *See Moreno*, 63 M.J. at 135.

Under these circumstances, we find no violation of Appellant's due process rights. *See Barker*, 407 U.S. at 138–40. Appellant is not in confinement and has not alleged any particular prejudice from the delay, and we perceive none. The delay in resolving his appeal is primarily attributable to his counsel's requests for enlargements of time and has not been so egregious as to adversely affect the perception of the military justice system. *See Toohey*, 63 M.J. at 362.

We have also considered whether relief for excessive post-trial delay is appropriate under Article 66(d)(2), UCMJ, even in the absence of a due process violation. *See Valentin-Andino*, at 367. We conclude such relief is not warranted.

## III. CONCLUSION

The findings as entered are correct in law and fact. Article 66(d), UCMJ (2024 *MCM*). In addition, the sentence as entered is correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court